UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT METCALF,

                Plaintiff,

      v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN; DAIMLER-CHRYSLER
NORTH AMERICA; and DAIMLER
TRUCKS N.A. LLC UAW HEALTH
BENEFITS PLAN,

                Defendants.

Case No. 3:11-cv-1305-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Robert Metcalf ("Metcalf"), a health care provider, alleges claims under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC §§ 1001-1461, to

recover benefits for medical services provided over a 21-month period between May 15, 2008,

and February 18, 2010,[1] to his 123 patients[2] who are participants in the defendant Daimler Trucks North America LLC UAW Health Benefits Plan ("Plan"), as well as penalties and injunctive relief.  The other two defendants are Daimler Trucks North America, LLC (the Plan Sponsor)[3] and Blue Cross Blue Shield of Michigan (the administrator).  This court has jurisdiction pursuant to 28 USC § 1331 and 29 USC § 1132.

The Amended Complaint alleges three claims.  Count I, titled a "Claim for Benefits Under Group Plans Governed by ERISA," alleges that defendants must pay benefits pursuant to assignments from the patients to Metcalf (Amended Complaint, ¶ 5.13), violated ERISA each time they denied or reduced benefits without complying with ERISA's requirements for dealing with an Adverse Benefit Determination (*id*, ¶ 5.14) and, by their lack of disclosure (*id*, ¶ 5.15), are estopped based on their actions from denying coverage without complying with ERISA (*id*, ¶ 5.16), and violated ERISA § 502, 29 USC § 1132, by unlawfully discriminating against Metcalf.  As relief, Metcalf seeks not only unpaid benefits with interest, but also "withdrawal of all claims for rescission or other relief against [him] in response to any such letters or demands," as well as "declaratory and injunctive relief related to enforcement of plan terms, and to clarify rights to future benefits."  *Id*, ¶ 5.18

Count II, titled "Failure to Provide Full & Fair Review as Required by ERISA," alleges that, as an assignee of his patients' ERISA benefits, Metcalf was entitled to a "full and fair review" of all claims denied and entitled to assert a claim under 29 USC § 1132(a)(3) (*id*,

---

[1]  This is the date range of claims alleged in the pleadings.  Amended Complaint, ¶ 4.14.  As shown by defendants' spreadsheets, Metcalf has submitted similar claims beyond February 18, 2010, and, in his opposition to summary judgment, requests leave under FRCP 15 to amend his allegations.  However, pursuant to LR 7-1(b), motions may not be combined with any response, reply, or other pleading.

[2]  Although the Amended Complaint refers to 124 participants, one is a duplicate.

[3]  The caption of the Amended Complaint refers to this defendant as Daimler-Chrysler North America.

2 – OPINION AND ORDER

¶ 5.20), that defendants failed to provide a "full and fair review" under 29 USC § 1133 and its implementing regulations by making claims denials inconsistent with the Summary Plan Description and failing to disclose critical information relating to such denials (*id*, ¶ 5.21), and that defendants used improper, invalid and undisclosed policies relating to the specified health care services, withheld payments for properly submitted claims, and effected other systematic benefit reductions without disclosure or authority, all in violation of ERISA (*id*, ¶ 5.22). Metcalf further asserts that, as a result of this conduct by defendants and the futility of exhaustion, his appeals should be deemed exhausted or excused (*id*, ¶¶ 5.24-5.25), that he has been harmed by defendants' failure to provide a "full and fair review" and failure to disclose relevant information in violation of ERISA and that he is entitled to injunctive and declaratory relief to remedy defendants' continuing violations (*id*, ¶ 5.26).

Count III alleges tortious interference with business relations premised on fiduciary duties owed to Metcalf as the participants' assignee.

The Prayer for Relief seeks: (1) declaratory relief that defendants: (a) breached the Summary Plan Description and failed to award paid benefits to Metcalf (*id*, ¶ 6.1); (b) failed to provide "full and fair review" under 29 USC § 1133 (*id*, ¶ 6.2); (c) violated disclosure and related obligations under ERISA (*id*, ¶ 6.3); and (d) violated federal claims procedures (*id*, ¶ 6.4); (2) injunctive and other equitable relief to prevent defendants' continuing actions, ensure compliance with ERISA and its implementing regulations, and remedy the violations (*id*, ¶¶ 6.1-6.4); (3) an order that defendants recalculate and issue payments to him for benefits that were not paid to him (*id*, ¶ 6.5); and (4) an award of penalties for violation of 29 USC § 1132(g) and 29 USC § 1021 for each piece of information they failed to provide him following a written request for that information.

3 – OPINION AND ORDER

Defendants have filed a Motion for Summary Judgment (docket # 53) on all claims, and

Metcalf has filed a Motion for Partial Summary Judgment (docket # 58) seeking various rulings

on issues related to those claims.  All parties have filed written consents to allow a Magistrate

Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC

§ 636(c).  For the following reasons, both motions are granted in part and denied in part.

### STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter," but

must instead only determine whether there is a genuine issue for trial.  *Balint v. Carson City*, 180

F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).  The substantive law

governing a claim or defense determines whether a fact is material.  *Addisu v. Fred Meyer, Inc.*,

198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).  The court must view the inferences drawn

from the facts "in the light most favorable to the non-moving party."  *Bravo v. City of Santa*

*Maria*, 665 F3d 1076, 1083 (9th Cir 2011).

Claims involving denials of benefits under ERISA are reviewed *de novo* by the district court "unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for the benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 115 (1989). The Plan does not confer discretion on the claims administrator. Therefore, this court must review defendants' claims decisions *de novo* based on the evidence that was before the claims administrator without any deference to the administrator's decision. *Kearney v. Standard Ins. Co.*, 175 F3d 1084, 1089 (9th Cir 1999). The court has discretion to consider evidence that was not before the claims administrator, but "'only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review.'" *Id* at 1090, quoting *Mongeluzo v. Baxter Travelnol Disability Benefit Plan*, 46 F3d 938, 944 (9th Cir 1995). If the court determines that genuine issues of material fact preclude summary judgment, then it must conduct a bench trial on the administrative record and make findings of fact and conclusions of law pursuant to FRCP 52(a). *Id* at 1095; *McHenry v. PacificSource Health Plans*, 679 F Supp2d 1226, 1230 (D Or 2010).

## UNDISPUTED FACTS

### I. Metcalf's Relationship to Plan

Metcalf is a chiropractor who has been practicing in North Carolina for 12 years. Metcalf Decl. (docket # 60-1), ¶ 1. During that time, he regularly treated patients who worked for Daimler Trucks North America, LLC ("DTNA") and participated in the Plan administered by BlueCross/BlueShield of Michigan ("BCBSM"). *Id*, ¶ 2. All 123 patients listed in the Amended Complaint were participants in the Plan.

The Plan provides payments for a broad spectrum of health care services to employees of DTNA. Abbiatti Decl. (docket # 13), Ex. A; Krafchik Decl. (docket #60), Metcalf Ex. 2

("Handbook").[4]  Claims are governed by the terms of the Health Care Handbook ("Handbook") which describes itself in the Introduction as "a handy reference" that "explains" the health care coverage.  *Id*, p. *i*.  However, the Handbook also states that it "is not a contract," that it is "intended as a brief description of benefits," and that the terms and conditions of "the applicable coverage documents" prevail over its statements.  *Id*.  Although the Handbook appears to be more of a Summary Plan Description ("SPD") of other documents that comprise the Plan,[5] defendants insist that the Handbook is the Plan and have produced no other document detailing Plan benefits or requirements.  Odd as it seems, this court has no choice at this juncture but to accept the Handbook as the one and only Plan document.

For each patient, Metcalf obtained two signed forms:  (1) an Insurance Assignment and Release ("AOB"), and (2) a Designation of Authorized Representative ("DAR").  Metcalf Decl. (docket #60-1), ¶ 6,  Ex. 3.  The AOBs state as follows:

> I certify that I, and/or my dependent(s), have insurance coverage with BCBS and assign directly to Dr. Metcalf all insurance benefits, if any, otherwise payable to me for services rendered.  I understand that I am financially responsible for all charges whether or not paid by insurance.  I authorize the use of my signature on all insurance submissions.

> The above-named doctor may use my health care information and may disclose such information to the above-named insurance Company(ies) and their agents for the purpose of obtaining payment for services and determining insurance benefits payable for related services.  This consent will end when my current treatment plan is completed or one year from the date signed below.

*Id*, ¶ 7.

---

[4]  Metcalf's voluminous exhibits are attached to Krafchik's Declaration and, with the exception of Metcalf's Declaration, will be referred to by exhibit number.

[5]  Metcalf certainly anticipated that another document would spell out the full details of the plan.  Amended Complaint, ¶ 5.3 ("The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage (EOC) that governs each members' health care plan.")

Each DAR designates Metcalf:

> to the full extent permissible under the Employee Retirement [I]ncome
> Security Act of 1974 ("ERISA") and as provided in 29 CFR 2560-503-
> 1(b)4 to otherwise act on my behalf to pursue claims and exercise all
> rights connected with my employee health care benefit plan, with respect
> to any medical or other health care expense(s) incurred as a result of the
> services I received from the above named doctor.  These rights include the
> right to act on my behalf with respect to initial determinations of claims, to
> pursue appeals of benefit determinations under the plan, to obtain records,
> and to claim on my behalf such medical or other health care service
> benefits, insurance or health care benefit plan reimbursement and to
> pursue any other applicable remedies.

*Id*, ¶ 8.

## II.  <u>Claims and Benefits Paid</u>

To receive reimbursement from BCBSM, Metcalf electronically submitted claims data
for services rendered to his patients to the host plan, Blue Cross Blue Shield of North Carolina
("BCBS-NC"), at or near the time he rendered treatment.  *Id*, ¶ 9; Metcalf Ex. 4; Quartuccio
Decl. (docket #57), ¶ 5.  BCBS-NC then transmitted the data to BCBSM to decide the claims.
Quartuccio Decl., ¶¶ 5-6.  BCBSM stored the claims data, which is the same information that
appears on an Explanation of Benefits form ("EOB"), in its Outcomes, Satisfaction, Cost
Analysis and Reporting System ("OSCAR").  *Id*, ¶ 8.  As the Plan's database for submitted and
adjudicated claims, OSCAR information includes the date of service, amount charged,
determination of the claim, amount paid, and where payment was sent.  *Id*.

For the purposes of this litigation, BCBSM utilized the OSCAR system to access the
claims data and transferred the claims data to a spreadsheet.  *Id*, ¶ 9, Ex. 2 [BCBSM SS 000001-
104].  It also compiled a spreadsheet for each participant identified in the Amended Complaint
listing the claims data for all claims received by BCBSM for services rendered by Metcalf during

the period alleged in the Amended Complaint. *Id*, Ex. 3 [BCBSM SSD 000001-942]. Each spreadsheet specifies the disposition of the claim, the Plan provision relied upon to deny or reduce the claimed benefit, the amount paid, the payee(s) and the amount attributable to deductibles and co-payments under the Plan. *Id*. According to the claims data stored in OSCAR, the Plan received $561,817.00 in claims for the 123 participants named in the Amended Complaint for services provided by Metcalf between May 15, 2008, and February 18, 2010. *Id*, ¶ 10(a). That total amount includes charges in excess of the service charge specified in the Plan ($10,375.01), rejected claims ($69,530.00), co-payments and deductibles ($108,899.45), amounts paid to Metcalf ($80,551.05), and amounts paid to the participants ($292,541.49). *Id*, ¶ 10(b)-(e) Accordingly, BCBSM denied charges of $79,905.01 as outside the coverage available under the Plan. *Id*, ¶ 11.

BCBSM's general practice is to send an EOB to participants at or near the time claims are adjudicated. *Id*, ¶ 7. Although BCBSM cannot obtain copies of EOBs after two years, the same information is contained in OSCAR. *Id*, ¶¶ 7-8.

From May through October 2008, BCBSM paid Metcalf directly and sent him Provider Vouchers[6] for each claim which noted the amount of any disallowed claims. Metcalf Decl., ¶ 15. Unlike EOBs, the Provider Vouchers do not indicate the reason for the disallowance. After November 1, 2008, BCBSM no longer paid Metcalf directly, but instead paid the "Subscriber," *i.e*. patient, without notifying Metcalf. *Id*.

Metcalf contends that he submitted Claim Forms that BCBSM never processed. *Id*; Ex. 6 (comparison of Metcalf's Claim Forms (Metcalf Ex. 4) and BCBSM's Spreadsheets (Ex. 5)), pp. 8-14 (4/21-5/19/08, 6/2/08, 7/23-28/08, 12/8/08, 12/19/08, 12/22-29/08, 1/5/09, 4/24/09).

---

[6] Although Metcalf refers to these forms as EOBs which BCBSM sends to patients, they were, in fact, Provider Vouchers which BCBSM sends to Network Providers.

BCBSM agrees that it did not process all of the claims that Metcalf claims he submitted, but disagrees that Metcalf submitted those claims in the first place.

## III.  <u>Request for SPD</u>

On December 1, 2008, Metcalf sent DTNA, c/o BCBSM in Michigan, a request for the Plan's SPD on behalf of one of his patients, Tony D. James, as his first step in pursuing payment for the amounts owed.  Metcalf Decl., ¶ 16; Metcalf Ex. 13.  He enclosed a copies of DAR and AOB signed by Mr. James and also notified BCBSM that "all patients with the plan have an [AOB] on file," as "also indicated in box 12, 13, and 27 on the 1500 form when the claim is filed."  *Id*, p. 3.

On December 5, 2008, Kelley Tickle in the Appeals Unit at BCBSM responded by refusing to acknowledge Metcalf's assignee rights or provide him with the SPD:

> All BCBSM underwritten products prohibit the assignment of any rights under such contract.  As a result, Mr. James was prohibited by contract from assigning his rights to you.  Therefore, any assignment of benefit is invalid.
>
> Additionally, BCBSM is not the Plan Administrator of Mr. James' group health plan.  Based upon our records, he is covered by the [DTNA] group health plan.  Consequently, BCBSM does not have a copy of this group's [SPD] and does not have any obligation to produce that document.  Please contact the group health plan for any plan documents.

*Id,* ¶ 17; Metcalf Ex. 14.

As a result, on December 8, 2008, Metcalf sent an SPD request to Terri Moore at DTNA corporate headquarters in Oregon, which was identical in all respects to the December 1 letter to BCBSM, except that it referenced a different patient, Keith M. Stallings.  *Id*, ¶ 18; Metcalf Ex. 15.  This letter likewise notified DTNA that Metcalf had AOBs on file for all of his patients. Metcalf Ex. 15, p. 3.

On January 5, 2009, Ms. Moore emailed the Handbook to Metcalf.   Metcalf Decl., ¶ 19; Moore Decl., ¶ 3.  The Handbook does not contain any provision barring assignments.

In a letter dated January 14, 2009, to Ms. Moore at DTNA, Hank T. Waters, Metcalf's former attorney, expressed concern that BCBSM may be violating ERISA in the way it was handling Metcalf's claims for services rendered to the patients, in particular by disregarding the patients' assignments to Metcalf.  Metcalf Ex. 17.  On February 10, 2009, Keith Carter, Key Account Manager at BCBSM, responded that:

> [BCBSM] does not recognize these [AOB] forms and our systems are designed to pay the benefit to the individual enrollee in the [DTNA] health care plan.
>
> BCBSM is regulated by the State of Michigan and its certificates and riders clearly state that BCBSM does not recognize assignment of benefits.  Self-funded plan benefits are administered in the same manner.  While the benefits are payable under the health care plan, the benefits will be paid to the individual enrollee.

Metcalf Ex. 21.

## IV.  First-Level Appeal

The Handbook provides for two levels of appeal of adverse benefit determinations to BCBSM and an optional third level of appeal to DTNA.  Handbook, pp. 70-72.  The first-level appeal must be requested within 180 days after receiving the claim decision.  A response is due with 30 days absent a written notice of a need for additional information.  The second-level appeal is due within 30 days after receipt of the level 1 determination, with a response due within 30 days absent a written notice of a need for additional information.   In the event of a denial or failure to timely issue a determination or "otherwise fail to comply with the review procedures for level 1 or level 2," suit may be filed under ERISA or a final appeal may be requested from the DTNA Benefits Committee.  *Id,* p. 71.  Again, a response from the Benefits Committee is due within 30 days absent a written notice of a need for additional information.  *Id*, p. 72.  In

addition, the person who reviews the adverse benefit determination "will be someone other than the person who issued that determination." *Id*, p. 73.

On January 26, 2009, Metcalf mailed a Notice of Appeal to Ms. Moore at DTNA. Metcalf Decl., ¶ 20; Metcalf Ex. 18. This appeal enclosed copies of DARs signed by his patients and an AOB and advised that all of his patients have an AOB on file. It also enclosed a spreadsheet entitled "Patient List – Detailed Spreadsheet with Error Explanation" setting forth 1,402 adverse benefit determinations (Metcalf Ex. 18a), EOBs (which are actually Provider Vouchers) for those claims that pre-dated November 2008 (Metcalf Ex. 18b)**,** and documents clarifying CPT coding guidelines (Metcalf Ex. 18c). Of those 1,402 adverse benefit determinations since May 15, 2008, 873 of them involved BCBSM's failure to provide Metcalf with a response to his claim or an EOB. Metcalf Decl., ¶ 20. Others involved errors described as "2 [or 3] co-pays deducted," "not a part of another service," co-pay/co-insurance discrepancy," or "not a duplicate." Metcalf also requested a long list of documents and information needed to pursue his appeal, including a copy of the SPD.

On January 30, 2009, Ms. Moore returned Metcalf's Notice of Appeal, stating that it could not be processed "since there is not [*sic*] evidence you have had any of the claims reviewed as stated in our procedures." *Id*, ¶ 21; Metcalf Ex. 19, p. 1. After an exchange of emails (Metcalf Ex. 20), Ms. Moore indicated that Metcalf had sent his appeal to the wrong entity (DTNA instead of BCBSM), advised that BCBSM "is the Administrator of our healthcare benefits plan," and cited Page i of the Handbook which provides as follows:

> [BCBSM] administers the benefit plan for your employer and provides administrative claims payment services only. [BCBSM] does not insure the coverage nor do we assume any financial risk or obligation with respect to claims. Benefits and future changes in benefits are the responsibility of your employer. Information concerning members may be

reviewed by [BCBSM], and may also be reviewed by your employer, on a limited basis, for specific purposes permitted by law.

*Id.*

On February 23, 2009, Metcalf sent to the Plan Administrator, DTNA, c/o BCBSM in Michigan, his Notice of Appeal which was substantively identical to the appeal he had sent to DTNA the prior month, except that the spreadsheet of adverse benefit determinations was longer, containing 2,469 adverse benefit determinations for the 123 patients listed in the Amended Complaint.  Metcalf Decl. ¶ 23; Metcalf Exs. 22, 22a.  Of those, 1,411 involved "No response/No EOB."  Metcalf Ex. 22a.

On March 17, 2009, Ms. Tickle from BCBSM responded by treating his request "as as a provider inquiry," advising that "any assignment of benefit is invalid" under BCBSM's contract, and noting that "[a]dditionally, BCBSM is not the Plan Administrator" and, thus, has no copy of, or obligation to produce, the SPD.  Metcalf Decl., ¶ 24; Metcalf Ex. 23.  Metcalf interpreted this letter as a denial of his appeal.  Metcalf Decl., ¶ 24.

**V.  Second-Level Appeal**

As a result, on April 1, 2009, Metcalf sent a Second Level of Appeal to the Plan Administrator,  DTNA, c/o BCBSM in Michigan.  *Id,* ¶ 25; Metcalf Ex. 24.  Once again, he requested documents and information, including:  a full and detailed explanation of why his claims were originally denied and of all appeal determinations; reference to the specific plan provisions on which the determinations were based; copies of any and all documents and information relevant to his claim for benefits, the adverse benefit determinations, and the appeals determination; copies of any and all administrative processes and safeguards designed to ensure compliance with the Plan; and a description of the Plan's claims and review procedures.   He also

again enclosed copies of AOBs and DARs, the spreadsheet of adverse benefit determinations previously sent to BCBSM, EOBs, and documents clarifying CPT coding guidelines.

Pursuant to the Handbook, BCBSM is required to provide a written determination of a request for review within 30 days of submission. In a letter dated May 29, 2009, nearly a month after the 30-day period expired, Ms. Tickle of BCBSM advised that it was "in the process of reviewing the appeals submitted." Metcalf Decl., ¶ 26; Metcalf Ex. 25.

On June 3, 2009, Metcalf sent a Request for First-Level Appeal to the Plan Administrator, DTNA, c/o BCBSM in Michigan, similar to his February 23, 2009 appeal, except that it addressed 190 new claims that had not been addressed by his first-level appeal, all of which involved "No EOB/No response." Metcalf Decl., ¶ 27; Metcalf Exs. 26 & 26a.

## VI. Final Review

On June 29, 2009, after a month passed with no response from BCBSM, Metcalf submitted a Request for Final Review to the Benefits Committee at DTNA in Oregon. Metcalf Decl., ¶ 28; Metcalf Ex. 27. This request raised the same issues as those in his prior appeals. Specifically, he requested final review of various adverse benefit determinations, the denial of his rights as his patients' assignee, and the denial of his rights as his patients' authorized representative. Metcalf Ex. 27, p. 1. And he again requested, among other things, "[c]opies of all documents, records, and other information relevant to the claimant's claim for benefits" regarding the claims he submitted to BCBSM during his February 23, 2009 appeal. *Id*, p. 2. He also requested review of BCBSM's dilatory behavior.

On July 2, 2009, Ms. Tickle responded to Metcalf's second-level appeal for claims decisions through December 2008. Metcalf Decl., ¶ 29; Metcalf Ex. 28. That response included a "Quick Chart" referencing all but one of the 88 patients addressed in the February 29, 2009

appeal.  Ms. Tickle explained that BCBSM processed no claims for the remaining patient for the

listed date range.  She also explained that BCBSM would not address any claims where Metcalf

had not received any EOB or adverse determination letter and that he could obtain the EOBs by

making a written request to the National Customer Service Center ("NCSC").  Metcalf Ex. 28,

pp. 1-2.   Regarding the claims indicated as "not part of another service," she confirmed that the

denial was correct (except for one patient which was adjusted) because Metcalf was a

Participating Provider until November 2008 and required to write-off those charges.  *Id*, p. 2.

She also confirmed that the denial was correct for all durable medical equipment ("DME") and

orthotic charges.  *Id.*  She further confirmed that the deductible, copay, and coinsurance amounts

were correct after May 14, 2008, when Metcalf was no longer part of the Preferred Provider

Organization ("PPO").  *Id*, pp. 2-3.  Finally, she stated that the claims indicated as "not a

duplicate" were being processed subject to the applicable coinsurance requirement.  *Id*, p. 3.

On July 6, 2009, Metcalf received a response from Julie Brown in the Appeals Unit of

BCBSM to his June 3, 2009 first-level appeal.  Metcalf Decl.,¶ 30; Metcalf Ex. 29.  This letter

parroted the response BCBSM had made to Metcalf's first-level appeal.

On July 22, 2009,[7] Metcalf sent a supplement to the DTNA Benefits Committee in

Oregon updating it on the appeal responses he had received since his June 29, 2009 request for

final review.  Metcalf Decl., ¶ 31; Metcalf Ex . 30.  Again Metcalf raised the same issues and

requested documents supporting BCBSM's adverse decisions.  He also sent a follow-up letter to

BCBSM challenging its actions.  Metcalf Ex. 31.

---

[7]  This document has no date, and Ms. Brown's response (Metcalf Ex. 33) refers to a letter dated July 28, 2009,
regarding post-service appeals. However, for purposes of these motions, the court will accept Metcalf's statement as
to the date.

On July 29, 2009, Ms. Moore of DTNA acknowledged receipt of his Benefits Committee appeal packages. Metcalf Ex. 32.

Ms. Brown responded to Metcalf's first-level post-service appeals on August 31, 2009, (Metcalf Decl., ¶ 32; Metcalf Ex. 33), and Ms. Tickle responded to Metcalf's second-level appeal on September 1, 2009 (Metcalf Ex. 34). These responses repeat BCBSM's prior responses.

Finally, on September 14, 2009, Ms. Moore responded to Metcalf's request for final review from the DTNA Benefits Committee. Metcalf Decl., ¶ 33; Metcalf Ex. 35. Ms. Moore summarily refused to review most of Metcalf's request because she needed "additional information" and repeated the arguments previously made by BCBSM. Specifically, Ms. Moore claimed that "there is not a process to make payments to Non-Participating Providers but to send claims payment to subscriber." Metcalf Ex. 35. Finally, as had BCBSM, Ms. Moore directed him to request EOBs from BCBSM's NCSC.

On November 21, 2011, after the filing of this action, defendants, through their counsel, provided Metcalf with another copy of the Handbook. Metcalf Ex. 39.

## DISCUSSION

The cross-motions for summary judgment raise a number of issues. With respect to Counts I and II seeking medical benefits and injunctive relief under 29 USC §§ 1132 and 1133, defendants concede that the Plan does not bar an assignments of benefits and erroneously advised Metcalf prior to this litigation that his assignments were invalid. However, they contend that Metcalf, as an assignee, is not entitled to payment of those benefits which the Plan has already paid to the patients-assignors in the total sum of $373,092.54, and, at best, can only pursue a claim under ERISA for denied benefits in the sum of $79,905.01. Even with respect to

those claims for denied benefits, defendants assert that Metcalf failed to exhaust the required administrative review process.  Defendants also seek summary judgment against Count III for tortious interference as preempted by ERISA and against any claims for penalties under 29 USC §§ 1021 and 1132(g) (as alleged in the Prayer for Relief) as not allowed against claims administrators.

In response, Metcalf seek partial summary judgment that:  (1) pursuant to the AOBs, he, as the assignee, and not his patients-assignors, should have been paid the benefits; (2) he, as the assignee, was entitled to receive copies of EOBs for claims he submitted, either at the time a decision was made regarding each claim or when he requested them during his appeal; (3) as the Plan Administrator, BCBSM should have sent him a copy of the SPD; and (4) BCBSM did not properly handle his first-level appeal by refusing to honor his AOBs and DARs and dismissing his concerns summarily rather than reviewing them on the merits.

## I.  **Threshold Issues**

### A.  **Defendants' Evidentiary Objections**

As a threshold matter, defendants object to certain evidence submitted by Metcalf.  For the reasons that follow, those objections are denied.

First, defendants object to Metcalf Exhibit 4 which purports to be copies of Claim Forms for services Metcalf rendered to his patients.  Metcalf never submitted Claim Forms to BCBSM in this format, but instead submitted the claims data electronically on 1500 Forms.  Metcalf Reply Decl. (docket # 79), ¶ 14.  Simply printing out the electronic information is unintelligible. *Id*, ¶ 15 & Metcalf Ex. 42.  However, printing out that information on 1500 Forms, as Metcalf did in Exhibit 4, accurately gives context by showing which question each piece of information

was answering. *Id*. Thus, Metcalf argues that the information contained on the Claim Forms in Exhibit 4 is identical to the information that he submitted electronically to BCBSM.

Defendants agree that Metcalf submitted electronic claims data on 1500 Forms and that most of that data is identical to the information in Metcalf Exhibit 4. However, they dispute that Metcalf electronically transmitted the following three items concerning an assignment shown on the Claim Forms in that exhibit:

1. Box 12 checked noting a "SIGNATURE ON FILE," by which each patient (or authorized signor) agreed to "authorize the release of any medical or other information necessary to process this claim. . . ." This notation "indicates there is an authorization on file for the release of any medical or other information necessary to process and/or adjudicate the claim;"

2. Box 13 checked noting a "SIGNATURE ON FILE," by which each patient (or authorized signor) agreed to "authorize payment of medical benefits to the undersigned physician or supplier for services described below;" and

3. Box 27 checked "YES" next to "ACCEPT ASSIGNMENT?," by which "the provider agrees to accept assignment under the terms of the payer's program." Metcalf Ex. 8, p. 51.

Metcalf states that his practice was to include each of these items on his electronic submissions. Metcalf Decl., ¶ 11. Only one patient, Rebekah Nichols, lacked a "SIGNATURE ON FILE" in Box 13. *Id*; Metcalf Ex. 4, pp. 2007-027. Defendants have submitted evidence that all of the claims data received through OSCAR is contained on its spreadsheet. Quartuccio Decl., ¶ 10. That spreadsheet does not include any assignment information. However, only the information that appears on an EOB is maintained in OSCAR. *Id*, ¶ 8. EOBs normally do not contain any information concerning assignments. Thus, nothing submitted by defendants directly contradicts Metcalf's testimony. Since defendants do not dispute that the Claims Forms

in Metcalf Exhibit 4 contain the same claims data that Metcalf submitted electronically, their objection to Metcalf Exhibit 4 is overruled.  Accordingly, even though Metcalf submitted copies to defendants of AOBs for only 93 patients in early 2009, defendants were on notice of the assignments by all of 123 patients upon receipt of the electronically submitted claims from Metcalf.

Second, defendants object to Metcalf Exhibits 7 through 12 as lacking foundation.  Based on the 2010 amendments to FRCP 56, the non-moving party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FRCP 56(c)(2).  As explained in the Notes, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is  anticipated."  Pursuant to FRE 901 which governs the authentication of evidence, Metcalf has demonstrated that none of these disputed exhibits lacks foundation or will lack foundation if and when offered at trial.

Metcalf Exhibits 7 and 8 are materials made publicly available by the National Uniform Claim Committee ("NUCC") on its website.  These materials bear content that speaks to their authenticity, such as NUCC logos or headers.  The manual in particular bears detailed information on how to understand and complete a 1500 Form and is copyrighted.  Metcalf Exhibit 9 (excerpts from the ChiroCode DeskBook) bears similar unique identifiers such as detailed information on making chiropractor claims and copyrighting notations.  Metcalf Exhibits 10, 11, and 12 are glossaries made available on BCBSM's own website.  Although not shown in the printed version, the website bears the logos of BCBSM and copyrighting notations.  Given that these materials were all created by entities such as the NUCC, ChiroCode, and BCBSM, this is sufficient authentication under FRE 901(b)(4).  Alternatively, Metcalf states

that, if necessary, he will present at trial testimony of individuals with personal knowledge to attest to the authenticity of these materials.

Third, defendants challenge Metcalf Exhibits 7 through 12 as inadmissible hearsay. However, the NUCC and ChiroCode materials (Metcalf Exhibits 7-9) qualify as learned treatises under FRE 803(18). Moreover, Metcalf, as a licensed chiropractor, relied upon the ChiroCode DeskBook and followed NUCC guidelines when filling out claim forms. Metcalf Decl., ¶ 10. Metcalf's testimony alone, if offered at trial, would be sufficient to admit the NUCC and ChiroCode materials as learned treatises. The BCBSM glossaries (Metcalf Exhibits 10-12) are not hearsay. Because BCBSM provided these glossaries on its publicly available website, under its logo, they constitute an admission of an opposing party and are admissible under FRE 801(d)(2).

Metcalf Exhibits 7 through 12 are not part of the administrative record submitted by defendants. However, this evidence is necessary for the court to conduct an adequate *de* novo review of the benefit decisions, including how to interpret the information on the 1500 Forms. *See Mongeluzo*, 46 F3d at 944. Thus, these exhibits are admissible for purposes of the summary judgment motions.

Fourth, defendants object to Metcalf Exhibits 13 through 35 which consist of correspondence between the parties. Most of these exhibits are contained within defendants' own claim file and submitted by defendants in support of summary judgment. Although the administrative record submitted by defendants does not contain the rest of this correspondence, Metcalf's Declaration confirms the authenticity of these letters. Since they were sent to or received by defendants in the course of administering the claims at issue, they are properly considered as evidence that was before the claims administrator.

Finally, defendants object to Metcalf Exhibits 18, 18a, 18b, and 18c as irrelevant. Metcalf responds that these documents are relevant to show that DTNA received his request for various pieces of information and documentation, thus entitling him to statutory penalties. For that limited purpose, they are relevant and admissible. In addition, these documents are relevant to Metcalf's claim that defendants allegedly thwarted his attempts at pursuing his administrative appeals, allegedly violating their duties under ERISA and, thus, entitling him to sue as if he had exhausted his administrative remedies.

### B.  Metcalf's Provider Status May - November 2008

As another threshold issue, the parties disagree as to when Metcalf became a Nonparticipating Provider under the Plan. While Metcalf contends that he was a Network Provider only through the end of 2007, defendants argue that he was a Network Provider through November 2008 and a Nonparticipating Provider thereafter.

The Handbook divides health care providers into three levels of participation that impact the costs for which the participant is responsible:  Network Providers, Out-of-Network but Participating Providers, and Nonparticipating Providers. Handbook, p. 9. The Plan makes benefit payments directly to a Network Provider (whether in-network or out-of-network but participating), but to the participant when treated by a Nonparticipating Provider:

> **Network Providers**
> To receive the highest benefit payment level, you should use health care providers within the PPO network. Network providers have signed agreements with BCBS, which means they agree to accept our approved payment, for a covered benefit, as payment in full. You will only pay for the copayments and coinsurances required by your coverage. . . .
>
> When you go to network providers, you do not have to send a claim to us. Network providers submit claims to BCBS for you, and they are paid directly by BCBS.
>
> * * *

20 – OPINION AND ORDER

**Nonparticipating Providers**

Nonparticipating providers have not signed agreements with BCBS. This means they may or may not choose to accept the BCBS approved amount as payment in full for your health care services.

If your present providers do not participate with BCBS, ask if they will accept the amount we approve as payment in full for the services you need. This is called participating on a "per claim" basis and means that the providers will accept the approved amount as payment in full for the specific services. You are responsible for any deductibles, copayments, and coinsurances required by your plan along with charges for non-covered services.

You are *usually* required to pay nonparticipating providers directly and then you will submit the claim to BCBS for reimbursement. Remember, the amount BCBS reimburses you may be less than the amount your provider charged. You are responsible for the amount the provider charged above the BCBS approved amount.

Handbook, pp. 19-20 (emphasis added).

Network Providers receive Provider Vouchers that explain benefits payments for services by that provider; but Nonparticipating Providers do not. Quartuccio Decl., ¶ 4. Instead, the Plan sends EOBs directly to patients treated by Nonparticipating Providers. EOBs contain more information than Provider Vouchers, such as the reason for any denied claim.

Before January 2008, Metcalf was a Network Provider with BCBSM. Metcalf Reply Decl., ¶ 2. The parties agree that he was not a Network Provider as of November 2008. Between January and October 2008, his status is disputed.

When DTNA switched from CIGNA to BCBSM, Metcalf decided to change his status with BCBSM to a Nonparticipating Provider (matching his status with CIGNA) in order to file claims directly with BCBSM, as he had done with CIGNA. *Id,* ¶¶ 3-4. Metcalf explains that he intended to continue to participate on a per-claim basis by "accepting assignment," meaning that he was willing to accept the Plan approved amount owed his patients as full payment for his

services, after deductions for copayment, coinsurance, or deductibles owed directly by the patients. *Id*, ¶ 4; Metcalf Ex. 12 (BCBSM Glossary P), p. 1. In January 2008, after the switch to BCBSM was completed, Metcalf filed his claims directly and electronically with BCBSM, but initially received no payments or responses. Metcalf Reply Decl., ¶ 5. About five months later, BCBSM denied receiving the termination of his Network Provider contract. *Id*, ¶ 6. He finally was informed that his status would change to Nonparticipating Provider as of May 15, 2008, and eventually received payment directly for services he had rendered from May through October 2008. *Id*, ¶¶ 7-9. But suddenly in November 2008 he stopped receiving payments or notices and learned in February 2009 that an internal transition by BCBSM was the reason. *Id*, ¶¶ 10-11.

BCBSM claims that Metcalf continued to be a Network Provider until November 2008 based on the Provider Vouchers that it sent to him during that time period.[8] Because only Network Providers receive Provider Vouchers, *ipso facto*, Metcalf must have been a Network Provider.

Metcalf submits that BCBSM simply made a mistake by paying him directly as a Network Provider from May through October 2008. With his Reply, Metcalf has offered a reasonable explanation why he was paid directly during that time period even though he had terminated his contract with BCBSM as a Network Provider. However, BCBSM has not had an opportunity to either verify or discount Metcalf's testimony through its own witnesses or records.

At the motion hearing, defendants asserted that Metcalf's status is material as to whether benefits should have been paid to him or to the participants, as well as what information he would have obtained as a Network Provider. However, with respect to Counts I and II, it appears that Metcalf's provider status has little or no bearing on the merits of the major issues.

─────────────────────────

[8] Metcalf also notes that BCBSM paid him directly for services on September 2 and October 19, 2009, when he clearly was a Nonparticipating Provider. Metcalf Ex. 5, pp. 753, 770.

During all relevant times, both while a Network Provider and a Nonparticipating Provider, Metcalf obtained assignments (AOBs, DARs, and boxes checked on the 1500 Forms) from each of his patients. Metcalf Decl., ¶ 6. The parties disagree as to whether those assignments entitled Metcalf to direct payment of benefits due under the Plan, whether Metcalf has standing to pursue claims and/or appeals of denials of benefits for 33 of his patients based on the failure to timely provide the assignments to defendants, and whether the assignments entitle Metcalf to pursue his patients' claims, if any, for statutory penalties for failing to provide information.

Either the assignments entitled Metcalf to demand payment of benefits directly to him rather than to his patients (primary thrust of Count I), to stand in the shoes of his patients for purposes of pursuing payment and/or appealing any determination and to request/demand documents under ERISA (primary thrust of Count II), and to obtain statutory penalties for the failure to provide information (relief requested in ¶ 6.7), or they did not. As discussed elsewhere in this Opinion, defendants were on notice of the assignments entitling Metcalf to direct payment of the benefits due his patients under the Plan, irrespective of whether he was a Network Provider or Nonparticipating Provider. In addition, as discussed below, Metcalf's electronic submissions of claims data put BCBSM on notice of the assignments at the time the claims were submitted (with the exception of one patient), entitling Metcalf the full range of rights conferred by those assignments. This included the right to pursue an appeal based on the denial or reduction of those claims, again, irrespective of whether Metcalf was a Network Provider or a Nonparticipating Provider. Finally, as discussed below, this court concludes that the statutory penalties Metcalf seeks are not available as a matter of law, rendering moot any issue about his provider status at the time he requested documents relative to such penalties.

As discussed below, it does appear that Metcalf's provider status affects the denial of

claims premised on the number of allowed chiropractic services per day.  Therefore, if necessary

to resolve those claims, this court will resolve the factual dispute as to Metcalf's provider status

at a bench trial.

## II.  <u>Count I (Claim for Benefits)</u>

Metcalf alleges in the Amended Complaint that the Plan improperly denied at least

$632,870.00[9] in claims submitted following his treatment of Plan participants.  As an assignee,

Metcalf is suing under ERISA's civil-enforcement provision which allows a claimant "to recover

benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan,

or to clarify his rights to future benefits under the terms of the plan."  29 USC § 1132(a)(1)(B).

The burden is on Metcalf to prove his entitlement to benefits under the Plan.  *Muniz v. Amec

Const. Mgmt., Inc.*, 623 F3d 1290, 1294 (9th Cir 2010).

Defendants contend that Metcalf has not produced any evidence to support his allegations

that the Plan denied payment of over half a million dollars in claims or to support his claim that

any benefits were improperly denied.  To the contrary, their evidence shows that the Plan

received $561,817.00 in claims for the 123 participants at issue for services provided between

May 15, 2008, and February 18, 2010, denied only $79,905.01 for services or charges not

covered by the Plan, and paid all benefits covered by the Plan, including more than $80,000.00

directly to Metcalf.  Quartuccio Decl., ¶¶ 10-11.  In addition, they argue that many of the alleged

---

[9]  Defendants contend that the pleadings allege aggregate claims of $623,667.  Quartuccio Decl., ¶ 10(a) and Ex. 2, Column L "Total Charges Per Plaintiff's Complaint."  However, a comparison of Metcalf's pleadings and defendants' chart (Quartuccio Decl., Ex. 2) reveals three items in the pleadings that do not match the chart (Assignee Nos. 76 ($12,328), 81 ($1,334), and 124 ($2,320) for total of $15,982), as well as two line items in defendants' chart that do not match the pleadings (Moore, John ($4,917) and Rebecca Nicholes ($1,862) for total of $6779).  Starting with defendants' figure ($623,667), then adding the items in the pleadings but not in the chart ($15,982), and subtracting the items in the chart but not alleged in the pleadings ($6,779), results in total aggregate claims of $632,870, which is the figure also calculated from adding all items in the Amended Complaint, ¶¶ 4.19.1-.124.

claims are not properly before the court because neither Metcalf nor his assignors complied with the Plan's administrative review requirement.

Based on the electronic information received by defendants from Metcalf, the amount at issue is substantially less than alleged. Accordingly, Metcalf's claim for payment of benefits breaks down into two subclaims: (1) a claim for benefits paid to the patients-assignors, rather than to Metcalf as the assignee ($292,541.49 - $350,518.55)[10]; and (2) a claim for benefits improperly denied ($79,905.01). Each subclaim presents different issues.

### A. Claim for Benefits Paid to Participants

The most significant issue concerns Metcalf's ERISA claim to recover benefits already paid to his patients-assignors. Defendants do not contest the validity of the assignments in the form of AOBs from 93 participants to Metcalf[11] and concede that, contrary to the position taken prior to this litigation, the Plan does not bar such assignments. Instead, defendants argue that Metcalf stands in the shoes of, and has no greater rights than, his patients-assignors. With respect to benefits due and paid by the Plan to the participants, defendants contend that Metcalf, as the assignee, cannot pursue an ERISA claim against the Plan.

ERISA permits only plan participants, beneficiaries, fiduciaries, or the Secretary of Labor to bring an action to enforce rights protected by ERISA. *See* 29 USC § 1132(a); *Miller v. Rite*

---

[10] The amount paid to Metcalf's patients rather than directly to Metcalf is unclear. Defendants contend that the aggregate amount is $292,541.49. Quartuccio Decl., ¶ 10(e) and Ex. 2, Column J "Total Paid to Subscriber." Meanwhile, Metcalf contends that the total is $350,518.55. Metcalf Ex. 6. Comparison of these two documents reveals that only about half of the amount stated for particular patients (subscribers) match. The remaining amount given by the parties in these documents differ, sometimes by as little as $5 (*i.e.* Janet Bruce; Tonya James; Megan Moore), and sometimes by as much as several thousand dollars (*i.e.* Amy Hawkey (over $3,000); Tony James (over $9,000); Donnie Phillips (over $7,000); Donald Sells (over $20,000); and Janice Sells (over $15,000)).

[11] BCBSM disputes that the DARs (which appoint Metcalf "to pursue claims and exercise all rights") constitute valid assignments. In addition, BCBSM denies receiving any assignments by virtue of the participants checking "SIGNATURE ON FILE" in boxes 12 (authorizing release of medical information) and 13 (authorizing payment to provider) and a "YES" in box 27 ("ACCEPT ASSIGNMENT?") as shown on the 1500 Forms submitted by Metcalf. Metcalf Ex. 4. However, as discussed above, it is undisputed that Metcalf submitted that information electronically to BCBSM.

*Aid Corp.*, 504 F3d 1102, 1105-06 (9th Cir 2007).  Health care providers, such as Metcalf, are not

participants or beneficiaries and, therefore, lack independent standing to sue under ERISA.

However, it  is well-established that ERISA plan participants and beneficiaries may assign their

ERISA rights to their health care provider.  *Misic v. Bldg. Serv. Employees Health & Welfare*

*Trust*, 789 F2d 1374, 1378–79 (9th Cir 1986).  As an assignee, the provider has standing "to

assert the claims of his assignors."  *Id* at 1379.  However, a provider cannot assert claims "which

arise from the terms of their provider agreements and could not be asserted by their patient-

assignors [and which] are not claims for benefits under the terms of ERISA plans."  *Blue Cross*

*of Cal. v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F3d 1045,1050 (9th Cir 1999).

    In both *Blue Cross of Cal.*, and the more recent case of *Marin Gen. Hosp. v. Modesto &*

*Empire Traction Co.*, 581 F3d 941, 949 (9th Cir 2009), the Ninth Circuit barred ERISA claims by

medical providers, based upon assignments from their patients of the right to payment of

benefits, against health care plans to recover additional payments based on their separate

provider contracts with the plans.  Unlike those cases, Metcalf does not seek the payment of

more money from the Plan based upon an independent obligation different than money owed to

the participants under the Plan.  Here pursuant to the terms of the AOBs, Metcalf is suing to

recover "all insurance benefits, if any, otherwise payable to [the plan participant] for services

rendered" and nothing more.  Therefore, Metcalf has derivative standing under ERISA as an

assignee to assert the claims of his patients-assignors to recover benefits due under the Plan

under 29 USC § 1132(a)(2).  Although he stands in the shoes of his patients-assignors, Metcalf

contends that his status as an assignee permits him to recover any benefits owed and not paid

directly to him, but instead paid to his patients-assignors.  This appears to be a novel issue not

yet addressed by any court.

ERISA does not define what rights and responsibilities are conferred by an assignment. When interpreting rights and obligations under ERISA plans, the courts are charged with developing a federal common law. *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 110 (1989). "In developing a federal common law to govern ERISA suits, federal courts may borrow from state law where appropriate, and be guided by the policies expressed in ERISA and other federal labor laws." *Babikian v. Paul Revere Life Ins. Co.*, 63 F3d 837, 840 (9th Cir 1995) (citation, brackets, and internal quotations omitted). An assignment of a right is a contractual issue generally governed by state law. Thus, this court turns to state law to determine what claims Metcalf can bring under ERISA as an assignee pursuant to his assignments.

Absent an alternative selection by the parties, contracts are governed by the law of the state with the most significant relationship to the transaction and the parties. RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 188 (1971). The AOBs, which assign the patients' claims for benefits to Metcalf, do not specify what law governs, but were entered into in North Carolina and dealt with payment for services rendered in North Carolina. Therefore, North Carolina law has the most significant relationship to the AOBs. According to North Carolina law, once a debtor receives notice of an assignment, the debtor must pay the assignee and does not discharge the debt by paying the assignor:

> A valid assignment may be made by any contract between the assignor and the assignee which manifests an intention to make the assignee the present owner of the debt. The assignment operates as a binding transfer of the title to the debt as between the assignor and the assignee regardless of whether notice of the transfer is given to the debtor. Notice to the debtor is necessary, however, to charge him with the duty of making payment to the assignee. This duty arises whenever the debtor receives notice of the assignment, irrespective of who gives it.

*Lipe v. Guilford Nat'l Bank*, 236 NC 328, 331, 72 SE2d 759, 761 (1952) (ruling that depositor who had assigned the deposit to a third party was not the real party in interest to sue the bank) (citations omitted).

Even if Oregon, where DTNA resides, has the most significant relationship to the AOBs, Oregon law concerning assignments is consistent with North Carolina law:

> [A]n obligor on a chose in action who has notice of the assignment of the beneficial interest in the chose in action is liable to the assignee if the obligation is paid other than by the terms of the assignment. *State Farm Ins. v. Pohl*, 255 Or 46, 464 P2d 321 (1970); *Alexander v. Munroe*, 54 Or 500, 101 P 903, 103 P 514 (1909). As these cases illustrate, the duty to honor the assignment falls on the obligor who has notice of the assignment. In essence, the agreed performance of the obligor has been transferred to a third party.

*McCallums, Inc. v. Mountain Title Co.*, 60 Or App 693, 697, 654 P2d 1157, 1159 (1982).

Both North Carolina and Oregon law are consistent with the general rule that a debt is discharged only by payment to the assignee:

> When there is a valid assignment in place, performance under a contract runs to the assignee. Thus, when a creditor assigns its interest in an existing debt owed to it, the debtor must generally pay the debt to the assignee, not the original creditor. . . .
>
> If a debtor without notice pays the debt to the assignor, the assignee may recoup the payment from the assignor.
>
> However, after a debtor has received notice of a valid assignment, or obtained knowledge of it in any manner, a payment to the assignor or any person other than the assignee is at the debtor's peril and does not discharge him or her from liability to the assignee . . . .

6A CJS Assignments § 106 (footnotes omitted).

Here Metcalf gave BCBSM notice of the AOBs each and every time he electronically submitted a claim for the services rendered to his patients (except for Rebekah Nichols).[12]  In addition, as early as December 2008 and on multiple occasions thereafter, Metcalf and his attorney notified BCBSM and DTNA that he had AOBs on file for each patient.  Defendants did not need to receive copies of the AOBs, merely notice that they existed.

Despite receiving notice of the assignments to Metcalf, defendants argue that they satisfied their obligation under the Plan by paying benefits to the participants.  They point to the language of ERISA that limits a claim against the Plan to "recover benefits due to [a participant] under the terms of his plan."  29 USC § 1132(a)(1)(B).  Since no benefits are due to a participant who has already been paid, albeit mistakenly, defendants contend that they have no further obligation to Metcalf as the assignee.

The problem with defendants' argument is that it ignores the state law governing assignments.  The basic tenant of assignment law is that payment to the assignor does not discharge the debt.  Once BCBSM received notice of an assignment of benefits from the participants to Metcalf, it was obligated by the state law governing the assignment to pay benefits to him.  By paying the assignor instead, the debt (in the form of benefits) remained "due" and owing under 29 USC § 1132(a)(1)(B).

This court is persuaded that ignoring state law governing assignments would undermine ERISA.  The purpose for allowing assignment of ERISA-governed health care benefits to providers is to protect participants from having to "pay potentially large medical bills and await compensation from the plan" or to delay receipt of benefits while their providers "evaluate the solvency of patients before commencing medical treatment."  *Misic*, 789 F2d at 1377.

---

[12] Metcalf presumably obtained an AOB from each patient prior to providing services and submitting any claim to BCBSM.  Metcalf Decl., ¶ 9.

29 – OPINION AND ORDER

Defendants correctly note that Metcalf, as the assignee, has a potential claim to collect benefits directly from his patients-assignors. However, this may not only be an illusory remedy, but also would likely force Metcalf and other health care providers to no longer rely on assignments from patients, but instead to delay treatment of patients until the patients pay or establish their ability to pay.

Thus, this court concludes that under the state law governing assignments, the debt is not discharged by the debtor who pays the assignor after receiving notice of the assignment. Even though the Plan paid benefits to the participants, its duty to pay benefits to their assignee (Metcalf) was not discharged. As a result, Metcalf, as the assignee, has a claim against the Plan for benefits mistakenly paid to each of his patients-assignors after BCBSM received notice of the assignment.

Defendants also argue that ERISA precludes Metcalf from recovering compensatory damages which are excluded from "equitable relief" available under 29 USC § 1132(a)(3); *Wise v. Verizon Communications, Inc.*, 600 F3d 1180, 1190 (9th Cir 2010); *Paulsen v. CNF, Inc.*, 559 F3d 1061, 1076 (9th Cir 2009). According to defendants, they are being asked to pay damages to Metcalf in addition to the benefits already paid to the patients-assignors as allowed by the Plan. However, as clarified at oral argument, Metcalf is not seeking anything other than payment of benefits due to his patients-assignors under the Plan. That relief is available under ERISA since payment by the Plan to the patients-assignors did not extinguish the obligation to pay benefits.

Based on the current state of the record, it is difficult to determine precisely how much Metcalf is entitled to recover from defendants. Metcalf contends that the Plan has paid his patients $350,518.55 in benefits (Metcalf Ex. 6, p. 5), but defendants have produced information that the amount paid to the patients, rather than to Metcalf, is $292,541.49 (Miller Decl., Ex. 1).

The reason for the difference between these two figures is not clear and cannot be resolved at this juncture.

**B. Denied Claims**

With respect to the claims which BCBSM partially or completely denied as not covered by the Plan, defendants concede that fact issues exist.

First, Metcalf contends that BCBSM did not process all of the claims that he submitted. Metcalf Decl., Ex. 6 (comparison of Metcalf's Claim Forms (Metcalf Ex. 4) and BCBSM's Spreadsheets (Ex. 5)), pp. 8-14 (4/21-5/19/08, 6/2/08, 7/23-28/08, 12/8/08, 12/19/08, 12/22-29/08, 1/5/09, 4/24/09).[13]  Defendants agree that BCBSM did not process those claims, but, based on the electronic information retained in OSCAR, contend that Metcalf never submitted those claims in the first place.  That factual dispute cannot be resolved on summary judgment.

Second, BCBSM denied claims for DME because DME is "only payable when provided by a durable medical supply company."  Metcalf Ex. 28, p. 2 , citing Handbook, p. 46.[14]  Metcalf responded that the Handbook requires only that DME be "prescribed by a physician" and that he "meet[s] the definition of physician in this context."  Metcalf Ex. 30, p. 3.  Metcalf is correct as to the wording of the governing provision in the Handbook, but the record is not clear whether he prescribed the DME at issue and whether he meets the definition of a physician.  This factual dispute cannot be resolved on summary judgment.

---

[13]  It is not clear how many of these claims correspond to or differ from BCBSM's list of claims not received. Metcalf Ex. 28 (July 2, 2009 letter in response to appeal requests), pp. 1-2.

[14]  BCBSM also denied claims for orthotic appliances because they must not only be "prescribed by a physician," but also "supplied by a fully accredited facility approved by the American Board of Certification in Orthotics and Prosthetics."  Metcalf Ex. 28, p. 2.  Metcalf has not submitted any evidence or argument disputing the validity of that denial.

Third, as to denied claims which Metcalf challenged as "not part of another service," BCBSM determined that the denial was correct based on the reimbursement guidelines which "provide for payment of up to a maximum of four chiropractic services per day."[15]  Metcalf Ex. 28, p. 2.  Considering Metcalf to be a Participating Provider until November 2008 (which is currently disputed), BCBSM advised that he was required to write-off charges for all services denied, leaving no adverse determination for appeal.  *Id*.  Metcalf challenged that denial because the Handbook includes no such limitation on the number of chiropractic visits per day.  Metcalf Ex. 30, p. 3; Handbook, p. 42.  In addition, Metcalf contends that the coding is not sufficiently clear for him to identify these particular denials.  Given the dispute over his provider status, summary judgment is premature on this issue.

Defendants also argue that Metcalf only submitted general, non-specific inquiries and failed to contest specific denials of claims.  However, based on defendants' mistaken conclusion that his assignments were invalid, Metcalf did not receive EOBs which contain the reason for denial of a claim.  He submitted all of the information he had at the time.  Through discovery in this case, he has received more information.  Nonetheless, at oral argument, Metcalf complained that the reason for the denial of a claim is not always listed on defendants' spreadsheet, requiring more time to investigate specific denials.

Additionally, Metcalf notes that some claims reflected on defendants' spreadsheets show that BCBSM paid money directly to some participants for which Metcalf has not located a corresponding claim form.  Yet Metcalf contends that he notified BCBSM of his assignments for those claims as well.  This is another fact issue that cannot be resolved now.

---

[15]  BCBSM did concede that it had erred and adjusted services for payment for one patient, Micky Stirewall.  Metcalf Ex. 28, p. 2.

Thus, determination as to which claims were properly or improperly denied as not covered by the Plan is premature.

### C.  Claims Not Administratively Exhausted

ERISA claims are barred if the participant fails to comply with the Plan's administrative review requirements.  *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F3d 629, 626 (9th Cir 2008).   Even if defendants are liable for failing to pay benefits to Metcalf as the assignee and improperly denying certain claims, they contend that the administrative review process was exhausted only for 70 of the participants for all claims and for all participants for claims for services after December 2008.

Metcalf submitted written requests for first- and second-level appeals of adverse benefit determinations to BCBSM on February 23 and April 1, 2009 (Metcalf Exs. 22 & 24), but they are limited to a subset of claims, either 70 (Miller Decl., Ex. 1)[16] or 88 (Metcalf Ex. 22a), of his patients-assignors for services rendered after December 2008.  In addition, defendants argue that no review was sought for any claims arising from services provided after December 2008.  Although Metcalf did send a first-level appeal to DTNA on June 3, 2009, for services since late December 2008 (Metcalf Ex. 26), defendants assert that he did not send it to BCBSM as required by the Plan.

Metcalf disagrees on the basis that he either completed the review process (for some of his claims) or was excused for doing so (for the remainder of his claims) based on futility,

---

[16]  Defendants' assertion appears to be based on its records where Metcalf's April 1, 2009 appeal is immediately followed by a spreadsheet that contains different claims than reflected in the exhibit submitted by Metcalf. However, as Metcalf correctly notes, BCBSM's records are frequently out of any discernible order, and Metcalf attests that his April 1, 2009 appeal contained the same exhibits as attached to his February 23, 2009 appeal. Metcalf Decl., ¶ 25.  In addition, Ms. Tickle's July 2, 2009 response addressed claims for all 88 patients referenced in Metcalf's first-level appeal.  Metcalf Ex. 35.

inadequate remedy and unreasonable procedures. *Vaught*, 546 F3d at 626-27; *Diaz v. United Agric. Employee Welfare Benefit Plan & Trust,* 50 F3d 1478, 1485 (9th Cir 1995).

In his January 26, 2009 letter, Metcalf requested a first-level review of adverse benefit determinations, enclosed copies of the Provider Vouchers (incorrectly referred to as EOBs) at issue, as well as a spreadsheet listing the alleged errors or lack of an EOB/response necessary for him to ascertain any error. Metcalf Ex. 18. He sent that request to DTNA, instead of BCBSM, even though he had received the Handbook by then. However, the Handbook states that the appeal must be mailed "to the address found in the top right hand corner of the first page of your [EOB] or to the address in the letter we send notifying you that we have not approved a benefit or service you requesting." Handbook, p. 71. He did not have any EOB or letter with an address, only the Provider Vouchers sent by BCBSM. Therefore, if he sent his appeal to the wrong entity, it was not entirely his fault. This court agrees.

As for his June 3, 2009 appeal, Metcalf points out that he sent it to the same entity and address as his February 23 and April 1, 2009 appeals (DTNA, c/o BCBSM in Michigan) and that BCBSM received and responded to that appeal. Metcalf Exs. 29 & 34. Since BCBSM treated this as a first-level appeal in 2009, it cannot be heard to argue otherwise now.

BCBSM denied the appeals primarily because Metcalf was a Nonparticipating Provider and failed to recognize him as an assignee of his patients. For many of the claims at issue, Metcalf indicated that he had received no response or no EOB. Since BCBSM believed that Metcalf was not entitled to an EOB, it did not deem those comments as an appeal from an adverse benefit determination. Otherwise, it explained the denials and adjustments and told Metcalf to request the EOBs from BCBSM's NCSC. However, as previously discussed, the assignments from the patients-assignors to Metcalf obligated BCBSM to respond.

The futility exception to administrative review "is designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail." *Diaz*, 50 F3d at 1485 (citations omitted). The "unreasonable procedures" exception is based on 29 CFR § 2560.503-1(*l*) that waives exhaustion of administrative remedies when "the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." As early as January 14, 2009, Metcalf's attorney placed DTNA on notice that BCBSM was "blatantly disregarding" the assignments to Metcalf and requested its intervention to resolve the issue. Metcalf Ex. 17. BCBSM responded, but did nothing further, such as involving legal counsel, to resolve the issue. Based on its erroneous conclusion that an anti-assignment provision in the Plan or Michigan law barred any assignment, defendants did not consider Metcalf's appeals on the merits (except as to the DME and number of allowed chiropractic visits which were appealed and denied), respond in a timely manner, ensure that his second-level review was conducted by a different person than his first-level review, or provide him with copies of the requested documents, records, and other information. By September 2009, Metcalf reasonably concluded that defendants would not consider the merits of his claims, rendering any further appeals -- either second-level appeals of his June 3, 2009 claims or first-level appeals of new claims based on the same grounds -- futile and doomed to a negative outcome, requiring the filing of a lawsuit. Therefore, none of his claims in the Amended Complaint are dismissed based on a failure to exhaust.

### D. **Other ERISA Violations**

The Amended Complaint refers to Count I as a claim for benefits under 29 USC § 1132(a)(2), but Count I broadly alleges that defendants violated ERISA for denying or reducing benefits "without complying with ERISA's requirements for dealing with Adverse Benefit Determinations" (Amended Complaint, ¶ 5.14), failing to notify the participants and

Metcalf of the Adverse Benefit Determinations (*id,* ¶ 5.15), and unlawfully discriminating against Metcalf (*id*, ¶ 5.17).  As relief, Metcalf seeks not only unpaid benefits with interest, but also "withdrawal of all claims for rescission or other relief against [him] in response to any such letters or demands," as well as "declaratory and injunctive relief related to enforcement of plan terms, and to clarify rights to future benefits."  *Id*, ¶ 5.18

It is difficult to square these allegations with the arguments made Metcalf in his motion. He argues that defendants violated his rights in several ways.  In addition to a failure to pay benefits to him as an assignee, he argues that they:

1.  Failed to notify him (as opposed to his patients-assignors) of every adverse benefit determination when made as required by 29 CFR § 2560.503-1(f)(2)(iii) (B) ("the plan administrator shall notify the claimant  . . .  of the plan's adverse benefit determination within a reasonable period of time . . . ");

2.  Failed to provide him, upon request, copies of multiple documents, records and other information relevant to his claim for benefits as required by 29 CFR § 2560.503-1(h)(2)(iii) and § 2560.503-1(m)(8).  These requested documents include the Handbook (Metcalf Exs. 13 & 22), EOBs from BCBSM (Metcalf Exs. 22, 24, & 26) and from DTNA (Metcalf Exs. 18, 24, & 40), any anti-assignment clause from BCBSM (Metcalf Exs. 22 & 24) and from DTNA (Metcalf Exs. 18 & 24), and support for contested denials of payments for DME or for chiropractic procedures beyond four per day (Metcalf Exs. 18, 22, & 30).  As a result, Metcalf seeks statutory penalties under 29 CFR § 1132(c)(1)(B) of $110 per participant per document per day for failing to provide him with the requested documents within 30 days his requests; and

3. Failed to provide him with a reasonable claims procedures and a reasonable opportunity to appeal his adverse benefits determinations with full and fair review as required by 29 CFR § 2560.503-1(b) and (h).

This third alleged violation falls within the allegations of Count II and is discussed below. The other two violations are not specifically alleged in the Amended Complaint and are not properly the subject of Metcalf's motion. However, based on the parties' submissions concerning the applicability of statutory penalties, the second violation also is addressed under Count II below. As to the first violation, even if alleged in the Amended Complaint, it arises out of defendants' refusal to deal directly with Metcalf based on their erroneous view that the assignments to Metcalf by his patients violated the terms of the Plan. Metcalf does not appear to request any particular relief for that violation in addition to payment of benefits due. Thus, it need not be addressed further.

### III. Count II (Failure to Provide Full & Fair Review)

Both Metcalf and defendants seek summary judgment on Count II which alleges that defendants violated 29 USC § 1133 by failing to provide a full and fair review of all claims, entitling Metcalf to assert a claim under 29 USC § 1132(a)(3) for injunctive and declaratory relief. Metcalf also seeks to recover statutory penalties under 29 USC § 1132(c)(1)(B) which provides as follows:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $[110] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph . . . each violation . . . with respect

to any single participant or beneficiary, shall be treated as a separate violation.

Defendants seeks summary judgment against this claim for several reasons, each of which is addressed below.

## A. **Plan Administrator**

First, defendants argue that Metcalf has not sued the right party. The penalty statute, 29 USC § 1132(c)(1)(B), only permits penalties against an "administrator" which ERISA defines as:

> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
> (ii) if an administrator is not so designated, the plan sponsor;
> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 USC § 1002(16)(A).

According to defendants, this is the definition of a Plan Administrator, as distinguished from a claims administrator. They argue that the Plan Administrator is "Daimler Trucks N.A. LLC Pension & Employee Benefits Committee" ("DTNA Benefits Committee") which is not a named defendant. They characterize BCBSM as the Claims Administrator who does not insure or provide benefits, and DTNA as the employer and Plan Sponsor who is responsible for the payment of benefits.

Although Metcalf alleged (Amended Complaint, ¶ 1.6) and defendants admitted (Amended Answer, ¶ 6) that the DTNA Benefits Committee is the Plan Administrator, Metcalf now contends that both DTNA and BCBSM are Plan Administrators. As evidence, he points to the first page of DTNA's Administrative Services Contract ("ASC") with BCBSM which lists Freightliner, *i.e.* DTNA, as "the plan sponsor and administrator" of the Plan. Metcalf Ex. 38,

p. 1.  However, the ASC is not a Plan document, and Schedule C to the ASC lists DTNA as the "plan sponsor" and refers only to unspecified administrative functions performed by DTNA.

Even if the ASC is ignored, Metcalf also relies on page i of the Handbook which states that BCBSM "administers the benefit plan for your employer and provides administrative claims payment services only," BCBSM's admission to Plaintiff's Interrogatory No. 8  that  "Plan Administrator under the Plan is [DTNA]" (Krafchik Decl., ¶ 1, Ex. 41, p. 7), and the fact that BCBSM handled all the first- and second-level Plan appeals.  Although this evidence inconsistently refers to either DTNA or BCBSM as the Plan Administrator, it does not lead to the conclusion that the DTNA Benefits Committee is the Plan Administrator.

Alternatively, if the Plan fails to designate a Plan Administrator, ERISA designates the Plan Sponsor as the Plan Administrator.  29 USC § 1002(16)(A)(ii).  DTNA does not dispute that it is the Plan Sponsor.

Therefore, based on the evidence in the record, one of the two defendants is the Plan Administrator who may be held liable for statutory penalties.  Which defendant is the Plan Administrator need not be resolved at this juncture.

**B.  <u>Standing</u>**

Even if ERISA permits Metcalf to pursue a claim for statutory penalties against BCBSM and/or DTNA, defendants contend that Metcalf lacks standing to seek statutory penalties.

ERISA permits only plan participants, beneficiaries, fiduciaries, or the Secretary of Labor to bring an action to enforce rights protected by ERISA.  *See* 29 USC § 1132(a).  Thus, Metcalf's standing is limited to the scope of his assignments and to the claims that could be brought by the participants themselves in pursuing a benefit claim or appeal of an adverse benefit determination.

*Eden Surgical Ctr. v. B. Braun Med., Inc.*, 420 F App'x 696, 697 (9th Cir 2011) (dismissing claims for penalties as beyond scope of assignment).

Here the AOBs include an assignment of "all insurance benefits, if any, otherwise payable to me for services rendered," as well as the right to act on the participant's behalf to pursue claims and exercise rights under the Plan and "to pursue any other applicable remedies." Contrary to defendants' characterization, that language is sufficiently broad to include a claim to recover penalties for failure to comply with 29 USC § 1132.

### C.  No Claim for Statutory Penalties

Defendants also argue that Metcalf has not alleged any claim for statutory penalties. Although the Amended Complaint fails to contain that specific allegation, paragraph 6.7 of the Prayer seeks statutory penalties of "$110.00 per day for violation of 29 USC 1132(g) and 29 USC § 1021 for each piece of information [defendants] failed to provide to [Metcalf] following a written request for that information."  In addition, paragraph 5.20 in Count II alleges that Metcalf "was entitled to receive a 'full and fair review' of all claims denied by Defendants, and entitled to assert a claim under 29 USC § 1132(a)(3) for failure to comply," and paragraphs 5.21 and 5.26 allege a claim under 29 USC § 1133 based on a failure to provide a "full and fair review."  Viewing these allegations broadly, the Amended Complaint is sufficient to state a claim to recover penalties under 29 USC § 1132(c)(1).

Even so, that claim would not support the requested relief.  As this court has previously held, 29 USC § 1132(c) does not impose penalties for a violation of 29 USC § 1133 and 29 CFR § 2560.503-1.  *Bielenberg v. ODS Health Plan, Inc.*, 744 F Supp2d 1130, 1143 (D Or 2010); *see also, Konty v. Liberty Life Assur. Co. of Boston*, No. 3:12-CV-00467-KI, 2012 WL 5363545 (D Or Oct. 30, 2012) ( "I carefully considered Judge Stewart's reasoning [in *Bielenberg*], as well as

the reasoning in the underlying cases.  I adopt the analysis as my own.  A violation of 29 CFR § 2560.503–1(j) cannot trigger a penalty under Section 1132 because the documents called for in the regulation do not fall within the list of documents covered by Section 1132.").

Metcalf argues that *Bielenberg* and *Konty* were wrongly decided and relied on an incomplete analysis of ERISA statutes.  Metcalf points out that that 29 CFR § 2560.503-1 was promulgated pursuant to 29 USC § 1135 (which permits the Secretary to promulgate regulations implementing all of ERISA), not just 29 USC § 1133.  Accordingly, Metcalf contends that 29 CFR § 2650.503-1 rightfully applies to both plans and plan administrators.  Finally, he asserts that, contrary to this court's conclusion in *Bielenberg* and *Konty*, the Ninth Circuit in *Sgro v. Danone Waters of N. Am., Inc.*, 532 F3d 940, 945 (9th Cir 2008), did reach the penalty claim issue, as evidenced by the fact that it remanded the case to allow the plaintiff to attempt to allege a cause of action against a plan administrator.

There is some logic to Metcalf's argument that if penalties under 29 USC § 1132(c) are not available premised upon a violation of 29 CFR 2650.503-1, then there would have been no point to remanding to allow the plaintiff in *Sgro* to allege such penalties.  However, the Ninth Circuit simply did not address this particular argument head on.  Instead, in a two-sentence paragraph, the opinion simply cites the regulation, notes that the requested documents were "generated in the course of making the benefit determination," then states that "ERISA's remedies provision gives Sgro a cause of action to sue a plan 'administrator' who doesn't comply with a 'request for . . . information.'"  *Sgro*, 532 F3d at 945.  This statement and the fact of the remand arguably support the conclusion that the parties in *Sgro* and the Ninth Circuit may have assumed that such penalties were available.  However, the question remains as to what the Ninth Circuit would conclude if confronted with the decisions in five other circuits, including the

First, Third, Sixth, Seventh, and Eighth Circuits, that have held to the contrary.  *See Medina v.*

*Metro. Life Ins. Co.*, 588 F3d 41, 48 (1st Cir 2009) ("It is well established that a violation of

§ 1133 and its implementing regulations does not trigger monetary sanctions under § 1132(c).");

*Brown v. J.B. Hunt Transport Services, Inc.*, 586 F3d 1079, 1089 (8th Cir 2009) (citing cases

from Third and Sixth Circuits and "agree[ing] with our sister circuits that a plan administrator

may not be penalized under § 1132(c) for a violation of the regulations to § 1133"); *Wilczynski v.*

*Lumbermens Mut. Cas. Co.*, 93 F3d 397, 405-06 (7th Cir 1996).  While Metcalf offers one

plausible interpretation of *Sgro*, this court stands by its decision in *Bielenberg* and will not read

into *Sgro's* remand a conclusion that is not expressly stated in the face of explicit and contrary

authority from five other circuits.

Moreover, the imposition of penalties is entirely "in the court's discretion."  29 USC

§ 1132(c)(1)(B).  Here the alleged violations all arise from the initial mistaken conclusion that

the assignments to Metcalf were invalid, such that he was not entitled to receive any documents

that he requested.  The primary reason Metcalf requested information was to pursue his claim for

benefits as an assignee.  Given this court's conclusion that he is entitled to payment of those

benefits, the imposition of penalties serves no purpose other than as an excessive punishment for

defendants failing to promptly correct their mistake of law.  Accordingly, even if statutory

penalties were available, this court would exercise its discretion against awarding them in this

case.

## IV.  **Count III (Tortious Interference)**

Defendants also seek summary judgment on Count III for tortious interference because it

is preempted by ERISA.  At a motion hearing on June 17, 2013, this court granted Metcalf's oral

motion to withdraw Count III (docket #80).  Accordingly, this portion of defendants' motion is denied as moot.

## V.  15th Affirmative Defense (Statute of Limitations)

Metcalf seeks summary judgment against defendants' 15th Affirmative Defense which alleges that his claims "in whole or in part, are barred by the statute of limitations in 29 USC § 1113, ERISA § 413."  Defendants clarified at the hearing that this defense does not apply to any claims which Metcalf submitted for administrative review.  Instead, it only bars claims for denied benefits that Metcalf did not submit for administrative review.  As to those claims, all of which post-date the February 2009 appeal, BCBSM contends that Metcalf has failed to exhaust his administrative remedies.

At this point, it is far from clear which claims, if any, this affirmative defense may bar. Therefore, summary judgment with respect to this defense is premature.

## ORDER

Defendants' Motion for Summary Judgment (docket # 53) is GRANTED in part as to liability on Count II for statutory penalties and otherwise DENIED, and plaintiff's  Motion for Partial Summary Judgment (docket # 58) is GRANTED in part as to liability on Count I as to his claim for benefits paid to his patients-assignors and otherwise DENIED.

To determine what issues remain for resolution by either supplemental motions or a bench trial and to set a case schedule, the court will set a telephone conference in the near future.

DATED August 5, 2013.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge